[Cite as *In re L.E.*, 2022-Ohio-3962.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| L.E. | : | CASE NO. CA2021-12-066 |
| | : | O P I N I O N<br>11/7/2022 |
| | : | |
| | : | |
| | : | |

APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 2017 JI 23840

Kroener Hale Law Firm, and Sloan Thacker, for appellant.

**HENDRICKSON, J.**

{¶1}   Appellant, Mother, appeals from the decision of the Clermont County Court of Common Pleas, Juvenile Division, designating the child's Father as residential parent and legal custodian of their minor daughter.

{¶2}   The child was born out of wedlock in September of 2012.  Mother filed a complaint to determine parentage in July of 2017.  Father's parentage was established in October of 2017, and he subsequently filed a complaint for shared parenting.  In July 2018, the court designated Mother as the child's legal custodian and residential parent and

ordered parenting time for Father on alternating weekends and alternating Thursdays overnight. The court also granted each party extended parenting time during the summer and established a meeting place for exchanges.

{¶3} In the spring of 2019, Mother met R.C. ("Stepfather") and married him nearly one month later. Mother and Stepfather live together with their infant son and Mother's other son who is 12 years old.

{¶4} In the fall of 2019, Father discovered that Stepfather overdosed on July 12, 2019, while parked in front of Mother's residence. It was later discovered that Stepfather had also overdosed on February 2 and July 2, 2019, with the later incident resulting in an OVI conviction. After the July 12 overdose, Stepfather became a resident at a drug treatment facility, Adult and Teen Challenge. Mother failed to notify the child's therapist, the court-appointed guardian ad litem (GAL), and Father of these events. Stepfather has been struggling with drug addiction since he was 18 years old, and he estimates that he has participated in drug abuse treatment programs approximately 12 times. Stepfather also estimates his longest period of sobriety to be three years.

{¶5} Upon learning of Stepfather's drug related events, Father filed a motion for emergency custody. In November of 2019, the court held a hearing and ultimately dismissed the motion, but ordered Stepfather to remain out of Mother's residence and ordered no contact between Stepfather and the child.

{¶6} After Mother's marriage to Stepfather, Mother repeatedly denied Father his parenting time. Father was unable to see the child for several scheduled visits, as well as for Christmas in 2019, and a planned family beach vacation. On February 21, 2020, Father filed a motion for contempt of visitation, and on March 18, 2020, Mother filed a motion to modify visitation. On March 12, 2021, Father filed a petition for custody. The court held hearings on all motions over a series of four days.

{¶7} On November 9, 2021, the trial court issued an order designating Father as the child's residential parent and legal custodian, and granting Mother parenting time. It is from this decision that Mother appeals, raising two assignments of error. We address the assignments together.

{¶8} Assignment of Error No. 1:

{¶9} THE TRIAL COURT'S BEST INTEREST HOLDING AND CHANGE OF CUSTODY CONSTITUTES AN ABUSE OF DISCRETION.

{¶10} Assignment of Error No. 2:

{¶11} THE TRIAL COURT'S DETERMINATION THAT THE HARM OF MOVING THE CHILDREN [*sic*] WAS OUTWEIGHED BY THE ADVANTAGES CONSTITUTES AN ABUSE OF DISCRETION.

{¶12} In Mother's first assignment of error, she argues that the trial court abused its discretion by finding that a change of custody was in the best interest of the child. Specifically, Mother asserts that the evidence was insufficient to show that Stepfather's drug addiction has negatively impacted the child, and that Mother is less inclined to follow court ordered visitation.

{¶13} R.C. 3109.04(E)(1)(a) governs the modification of an existing custody order. The statute provides that "[t]he court shall not modify a prior decree allocating parental rights and responsibilities" unless it finds that, based on new facts unknown to the court at the time of the prior decree, that "a change has occurred in the circumstances of the child, [or] the child's residential parent, * * * and that the modification is necessary to serve the best interest of the child." R.C. 3109.04(E)(1)(a).

{¶14} Thus, when applying the statute, the court may not modify a prior custody determination unless it first finds that a change has occurred in the circumstances of the child or the child's residential parent. *Cravens v. Cravens*, 12th Dist. Warren No. CA2008-

02-033, 2009-Ohio-1733, ¶ 34. Second, after finding a change in circumstances, the court must determine whether the modification is in the child's best interest. *Id.*

**{¶15}** In addition to these two requirements, the trial court "shall retain the residential parent designated by the prior decree" unless "the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child." R.C. 3109.04(E)(1)(a)(iii); *Jillian F. v. Curtis C.*, 5th Dist. Tuscarawas No. 2018 AP 04 0016, 2018-Ohio-5373, ¶ 30. Thus, in order for the trial court to modify the residential parent, the court must find that (1) there is a change in circumstances, (2) the modification serves the best interest of the child, and (3) the harm resulting from a modification is outweighed by the advantages of such a modification. *In re Nentwick*, 7th Dist. Columbiana No. 00 CO 05, 2002-Ohio-1560, ¶ 36. The record must support each of these findings or else the modification of child custody is contrary to law. *Id.*

## A. CHANGE IN CIRCUMSTANCES

**{¶16}** A change in circumstances is the threshold requirement intended to provide stability to the residential status of the child. *Davis v. Flickinger*, 77 Ohio St. 3d 415, 417 (1997). Mother does not challenge the trial court's finding that there was a change in circumstances. It is undisputed that since the June 2018 order, Mother married Stepfather, and Stepfather's addiction became an integral part of the family dynamics. The trial court found that Mother deliberately withheld this information from Father, the GAL, and the child's therapist. The trial court also found that after the prior order, Mother demonstrated a pattern of unwillingness to cooperate and facilitate Father's parenting time.

## B. BEST INTEREST OF THE CHILD

**{¶17}** The determination of what is in the best interest of the child is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *Bonifield v. Bonifield*, 12th Dist. Butler No. CA2020-02-022, 2021-Ohio-95, ¶ 11. An abuse of

discretion implies that the trial court's decision was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A trial court's decision does not constitute an abuse of discretion "if it is supported by a discernible rational basis." *In re B.B.*, 12th Dist. Clermont No. CA2019-07-057, 2020-Ohio-4007, ¶ 16.

**{¶18}** With respect to the duty of deference to the trial court in disputes over the custody of children, the Ohio Supreme Court has stated that "the discretion which a trial court enjoys in custody matters should be accorded the utmost respect" considering the impact the court's decision has on the lives of the parties involved. *Miller v. Miller*, 37 Ohio St. 3d 71, 74 (1988). "The knowledge that the trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by printed record." *Id.* Thus, we are guided by the presumption that the trial court's findings were correct.

**{¶19}** In determining the best interest of a child, the court is required "to consider all relevant factors," including a non-exclusive list of ten specific factors. R.C. 3109.04(F)(1). In addressing the best interest factors, the trial court found that both parents want legal custody of the child, the child is bonded and integrated into each party's home, the child has a healthy relationship with each parent's family, and though the child struggled in her early grades, she is now progressing in school with the implementation of her I.E.P.[1] The child also regularly participates in age-appropriate extracurricular activities, in which both parents are involved. See R.C. 3109.04(F)(1)(a), (c), and (d). The court found that the factors under R.C. 3109.04(F)(1)(b), (h), (i), and (j) are not applicable or relevant.[2]

---

1. An Individualized Education Program (I.E.P.) is a written education plan designed to meet a child's specific learning needs. Here, the child was given an I.E.P. due to her diagnosis for ADHD and the general concern shared by her teachers regarding her slow academic progress.

2. We note that while the trial court found R.C. 3019.04(F)(1)(i) was not applicable, the record supports a finding that Mother continuously and willfully denied Father's right to parenting time.

**1. WILLINGNESS TO FACILITATE PARENTING TIME**

{¶20} The court found that Mother demonstrates an unwillingness to cooperate with Father regarding his parenting time. *See* R.C. 3109.04(F)(1)(f). Mother does not challenge the trial court's finding that she was in contempt for visitation, but the trial court's finding of contempt is relevant to this factor of the best interest analysis. Mother instead challenges the finding that she is less willing to cooperate with Father regarding parenting time, arguing that the trial court "failed to note that it was the minor child's outbursts" and Mother's "concerns for the child's safety at Father's" as her reason for limiting the child's time with Father. Mother now contends that because her concerns regarding the child's safety have been addressed, there is no evidence to support that she would not now facilitate Father's parenting time. Given the evidence of Mother's past behavior, we are not convinced.

{¶21} On more than one occasion, Mother denied Father his parenting time in violation of the court's July 2018 order for reasons unrelated to the child's safety. For instance, in February of 2020, Mother requested that Father cancel his parenting time to accommodate Stepfather's birthday. Father refused and Mother made herself and the child unavailable when Father arrived to pick up the child. Mother testified that she thought stepparents "got birthday time too," but provided no support for why she was justified in denying Father's scheduled time.

{¶22} Most notably, Mother prevented Father from seeing the child on Christmas Day of 2019. Instead, the child spent the week with Mother and Stepfather's family, and Mother failed to communicate with Father until early January. Mother also prevented Father from including the child on Father's family vacation to Myrtle Beach in May of 2020. Mother gave Father no explanation for why the child could not attend the vacation. Instead, she sent a photo of the minor child near the exchange location, almost two hours after the scheduled drop off time, and shortly thereafter texted Father that she and the child were

back at Mother's home.

**{¶23}** Mother testified about a series of text messages in which Mother informed Father that she would not bring the child to the exchange location unless he promised to bring money "for childcare." Father was also told that the money was needed for "gas" to transport the child. At the hearing, Mother was asked if she genuinely needed gas money, and Mother indicated that there were times when she and Stepfather had to "make things up" or give some sort of reason why they couldn't meet at the exchange location in order to compel Father to come to their house to pick up the child. When Father would refuse, Mother blamed any missed parenting time on Father.

**{¶24}** Mother provides no legal support for why she can unilaterally decide to deny Father his parenting time. Mother alleges that she denied parenting time because she was afraid for the child's safety based on the child's behavior prior to visits with Father, yet Mother never filed any motions with the court to address her concerns. We also note that the child never alleged, nor was there any evidence, that the child's time with Father put the child in any danger. The GAL never recommended reducing Father's parenting time, and the child repeatedly expressed to her therapist that her visits with Father were going well and that she felt happy during the visits.[3]

**{¶25}** In denying Father's parenting time, Mother did not demonstrate any perceived immediate serious physical harm to the child; she simply denied Father his parenting time. *See Williams v. McGuire*, 9th Dist. Lorain No. 21CA011784, 2022-Ohio-3598, ¶ 26 (In finding a father in contempt, the trial court noted that father's reasons for denying visitation "did not include any perceived immediate serious physical harm and that he refused

---

3. We also point out that Mother repeatedly attempted to have the child undergo an evaluation at the Mayerson Center for Safe and Healthy Children at Cincinnati Children's Hospital Medical Center, but the center refused because there was never any disclosure of sexual abuse.

visitation instead of seeking a modification of the visitation order."); *see also In re S.J.S.*, 2nd Dist. Montgomery No. 28801, 2020-Ohio-5105, ¶ 91 (finding that the court did not abuse its discretion in granting legal custody to father when mother had "continuously and willfully denied [f]ather's rights to parenting time by multiple means, including unsubstantiated claims of child abuse and repeated interference and manipulation at exchanges.").

{¶26} The trial court did not err in finding that Mother is less likely to honor and facilitate court-approved parenting time rights. Mother tends to alter the parenting time schedule in accordance with her own desires and her family's schedule as opposed to following the orders of the court. The trial court found that Father, on the other hand, was "undaunted in his attempts to maintain a consistent parenting time schedule." The record reflects that Father regularly arrived at the exchange location for his parenting time, and there were no instances of Father preventing or denying Mother from exercising her court ordered parenting time.

### 2. CHILD'S RELATIONSHIP WITH PARENTS

{¶27} Mother also challenges the court's analysis of the child's relationship with Father. *See* R.C. 3109.04(F)(1)(c). Father lives with his wife (the child's Stepmother), as well as Stepmother's 15-year-old daughter, and Stepmother's aunt. Mother asserts in her brief that Father and Stepmother are now divorced, and Father has moved to Kentucky. These facts are not a part of the record and thus we will not address them. App.R. 12(A); *State v. Salim*, 8th Dist. Cuyahoga Nos. 56925 and 57964, Ohio App. LEXIS 1933 (May 17, 1990) ("A reviewing court cannot consider matters not part of the record before it and then decide the appeal on the basis of additional matters.").

{¶28} Mother argues that the court failed to consider the amount of time that the child spends with Father during his parenting time, asserting that the child spends all of her

time with Stepmother while Father sleeps. While Father does have to work overnights, Father testified that he spends time with the child after school completing homework, playing, and having dinner together before bedtime. Father also changed his work schedule so he could spend more time with the child during his parenting time.

**{¶29}** Mother argues that the child has a much closer relationship with Mother and Mother's family than with Father, "as much of the child's time with Father was actually spent with his now ex-wife." As noted above, we decline to consider facts not before the trial court. At the time of the trial court's decision, Father and Stepmother lived together and there was evidence to demonstrate that the child was bonded to the family unit. The GAL stated that Father should spend more time with the child during visits, but it is important to note that the child's relationship with family members is only one factor among many in the best interest analysis. It is "the role of the trial court to determine the relative weight to assign each factor, in relation to the others, when determining the children's best interest." *Ruble v. Ruble*, 12th Dist. Madison No. CA2010-09-019, 2011-Ohio-3350, ¶ 18.

**{¶30}** Thus, it is within the purview of the trial court to place less weight on this factor when determining the best interest of the child. "This court should not, and will not, second-guess the domestic relations court's decision in regard to the appropriate weight to be given to any one of those factors." *Blessing v. Blessing*, 12th Dist. Clermont No. CA2019-01-011, 2019-Ohio-3951, ¶ 18. As it is the role of the trial court to determine the relative weight to assign each factor, we do not find that the trial court abused its discretion in placing less weight on this factor.

### 3. MENTAL HEALTH OF THOSE INVOLVED

**{¶31}** The trial court was most concerned about the impact of Stepfather's drug addiction on the child and how Mother handled the drug use. See R.C. 3109.04(F)(1)(e). Mother challenges the trial court's analysis of this factor, asserting that there was no

evidence presented to show that Stepfather's drug addiction impacted or harmed the child.

**{¶32}** Stepfather testified that he met Mother in April of 2019. At that time, he resided in a residential treatment center. In June of 2019, Stepfather moved from his residence at the recovery center into Mother's home, and married Mother a few weeks later. In one of his interviews with the GAL, Stepfather informed the GAL that he first relapsed around October of 2019 and that he left the home and stayed elsewhere when he relapsed.

**{¶33}** In January of 2020, Mother called the police to her home. The police report stated that Mother wanted "documentation for court purposes," and that she was afraid to go home due to Stepfather "using Meth daily." She also advised the police that Stepfather "snorts, smokes and injects it daily," and that "she fears that the kids will find the Meth or drug paraphernalia because he leaves it laying around the house." Mother later attempted to explain away this report, claiming that she never made those statements to the officers.[4] However, Mother also testified that sometime in January of 2020, she found a bag of brown powder in the car, and that there was a time in February of 2020 when Stepfather was staying in a hotel room while he was using drugs. During this time, Stepfather's presence in the home was sporadic.

**{¶34}** On July 2, 2020, Stepfather was found unconscious in his vehicle with a needle next to him. NARCAN was required to revive him, and he was subsequently charged with an OVI.[5] At roughly 8:30 a.m. on July 12, 2020, police responded to a call from Mother. Stepfather was again found unconscious in his vehicle, this time parked just outside Mother's home. The child was present in the home at the time. Emergency services personnel found a syringe embedded in Stepfather's arm and administered two doses of

---

4. When asked if Mother was aware that there was a police report contrary to her testimony, she responded, "I'm just going to have to give that one to God."

5. NARCAN is a medication designed to help reverse the effects of an opioid overdose.

NARCAN to revive Stepfather, who was unconscious and in need of CPR. Mother advised the responding officers that Stepfather had a history of drug use and had overdosed twice before.

{¶35} The record demonstrates that Mother has downplayed Stepfather's drug addiction and withheld information surrounding his extensive drug use. Mother has also been out of touch with the reality of his addiction. During the November 2020 hearing on Father's motion for emergency custody, Mother stated that the overdose on July 12 was Stepfather's "first time" overdosing since his previous recovery. At the April 2021 hearing, Mother was confronted with the information that Stepfather had overdosed on July 2. When asked if that information changed her perception as to whether the July 12 incident was a one-time drug use incident, Mother said, "no." She thereafter explained that he overdosed on February 4 and immediately went to Teen Challenge. She also stated that she has "a few receipts of him being in a hotel" and that "he was never home when he was using." Mother has long been aware of Stepfather's drug issues, but she insists that these incidents are not indicative of a severe problem, and her willingness to share any information regarding Stepfather's addiction has been reluctant at best.

{¶36} Mother declined to inform those responsible for the care of the child—including the child's own Father, the GAL, and the child's therapist—that Stepfather had relapsed. The GAL visited Mother's home in August of 2020, well after the three overdose incidents, and Mother did not inform the GAL of Stepfather's multiple relapses, or that he was living at Teen Challenge. Stepfather himself failed to inform the GAL of his residence and his history of drug abuse when he first spoke with the GAL. It is very concerning that Mother and Stepfather chose to conceal Stepfather's drug use, as well as the resulting instability in the home, from those responsible for the care of the child. As the GAL observed, "Mother's need to be with Stepfather is overshadowing what is the best home

environment for the child." During the time that Stepfather was struggling with his addiction, overdosing, and sometimes staying out of the home for periods of time, Mother insisted that the child have a father-daughter relationship with Stepfather.

{¶37} Mother paints the trial court's decision as being unfairly focused on Stepfather's drug use. However, Mother fails to recognize that it is the combination of Stepfather's drug use and her own inability to do what is best for the child that warrants a change in the child's legal custodian. The GAL stated that "Mother does not seem to perceive reality accurately" and continues to "blame others" for any issues the child experiences while failing to own up to her own role that she and Stepfather have played in causing disruption to the child's life. Based on her behavior, the GAL and the trial court expressed concern for how Mother would proceed if Stepfather relapsed again. We share those same concerns.

{¶38} We do not find that the trial court erred in weighing the best interest factors. Mother demonstrated a pattern of withholding information to those involved in the child's life. Furthermore, Mother's distorted perception of the reality of Stepfather's drug addiction and its impact on the family unit is concerning. The trial court did not err in determining that it was in the best interest of the child to award custody to Father.

### C. THE POTENTIAL HARM CAUSED BY A CHANGE OF ENVIRONMENT IS OUTWEIGHED BY THE ADVANTAGES

{¶39} In her second assignment of error, Mother argues that the facts do not show that the harm of changing the child's environment was outweighed by the advantages. *See* R.C. 3109.04(E)(1)(a)(iii). Mother asserts that there is great harm in changing the child's environment due to the child's relationship with Mother, as well as the disruption caused by switching schools.

{¶40} We previously addressed the child's relationship with Father in our discussion

of the best interest factors. We reiterate, however, that the GAL noted in her supplemental report that while the child and Mother do share a close relationship, the child's therapist and the child have expressed that Father's parenting time is improving. As the trial court noted, "[i]t is reasonable to expect that, under these extraordinary circumstances, the minor child would suffer some adjustment issues as a result of being nearly five years old when she met her father for the first time." We agree that the child is likely to experience some turmoil in adjusting to having her Father in her life, but all of those involved in the care of the child share no concerns with the development of Father and child's relationship.

{¶41} Mother also contends that the child requires the support of her current school in order to facilitate her IEP and address her academic difficulties. Mother argues that moving to an entirely new school district will have a severely negative impact on the child's academic and social progress. This argument is not well taken given that the child successfully transitioned schools at the start of second grade, and also successfully transitioned back into a school setting after Mother unsuccessfully attempted to home school the child for two months.

{¶42} The harm to the child caused by the change of environment would be specific to the child leaving the primary caregiver and home she has known throughout her childhood. The evidence established that the child was doing well in school and had a group of friends around Mother's home, as well as participated in extracurricular activities related to her school. "Undeniably, moving to a new home and school district would present challenges to any child." *In re R.A.S.*, 12th Dist. Warren No. CA2011-09-102, 20212-Ohio-2260, ¶ 26. However, Mother demonstrates an inability to be forthcoming with information regarding the environment of the child. The stability of Mother's home environment is also highly questionable, considering that Mother quickly married a recovering drug addict who proceeded to relapse several times. Mother is unable to recognize how her own decisions

directly and indirectly impact the life of her child, and instead chooses to blame others for her family's situation. In a supplemental report, the GAL shared that Mother had sent both the GAL and the child's school counselor "numerous emails that display a range of emotions." In these emails, Mother blamed the GAL and the child's therapist for the court's issuance of a no contact order against Stepfather and the alleged harm caused to the child. Mother has never taken ownership of how her own decision making and the decisions of Stepfather contributed to any instability that the child may feel.

**{¶43}** Although Mother maintains that designating Father as residential parent causes more harm than good, there is evidence to support the trial court's findings to the contrary. There was competent, credible evidence to support the trial court's finding that designating Father as the residential parent serves the best interest of the child, and that the advantages of changing the child's environment was not outweighed by the likely harm. Having found no abuse of discretion in granting Father as legal custodian and residential parent, Mother's first and second assignments of error are overruled.

**{¶44}** Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.