[Cite as *In re M.B.*, 2024-Ohio-3239.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| M.B., et al. | : | CASE NOS. CA2024-03-009 |
| | | CA2024-03-010 |
| | : | CA2024-03-011 |
| | | CA2024-03-012 |
| | : | CA2024-03-013 |
| | | CA2024-03-014 |
| | : | |
| | | O P I N I O N |
| | : | 8/26/2024 |

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS,
JUVENILE DIVISION
Case Nos. 22-D000044, 22-D000045 and 22-D000046

Lauren L. Clouse, attorney for appellant, father.

Tyrone P. Borger, attorney for appellant, mother.

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

**HENDRICKSON, J.**

{¶ 1} Appellants, the biological mother and father of My.B., Me.B, and T.B., separately appeal from a decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of their children to appellee, Warren

County Children's Services ("the Agency").[1] For the reasons discussed below, we affirm the juvenile court's decision.

**{¶ 2}** Mother and Father, who are married, originally resided with their three children, My.B., born September 14, 2006, Me.B., born December 19, 2008, and T.B., born December 18, 2009, in California. They moved east and settled in Kentucky for a brief period of time before moving to Ohio. The family was homeless, living in a tent. The Agency became involved with the family when, on June 30, 2022, all five members of the family went to Urgent Care. Father claimed they had been exposed to pesticides while Mother claimed they all had heat stroke. My.B. and Me.B. had bruises on their feet and ankles and all the children had trench foot.[2] The children were wearing multiple layers of clothing, despite it being 90 degrees outside, and reported that they bathed only when swimming. The children had not regularly attended school since before the COVID-19 pandemic began, and Mother claimed that she was unaware that schools had "opened back up" following the pandemic. Neither Me.B. nor T.B. knew their birthdays.

**{¶ 3}** The children were removed from their parents' care and placed in the emergency shelter care and temporary custody of the Agency. A court-appointed special advocate ("CASA") was appointed for the children. On July 1, 2022, complaints were filed alleging that the children were neglected and dependent children. Following certain stipulations of fact from Mother and Father, the children were adjudicated neglected and dependent on August 31, 2022. A dispositional hearing was held on September 28, 2022. In both instances, the juvenile court continued the order of temporary custody with

---

1. Mother's and Father's appeals were consolidated after appellate briefing was concluded. *In re M.B., et al.*, Warren Nos. CA2024-03-009 thru CA2024-03-014 (July 30, 2024) (Entry of Consolidation).

2. Trench foot is "a painful foot disorder resembling frostbite and resulting from prolonged exposure to cold and wet." *Merriam-Webster Online*, https://www.merriam-webster.com/dictionary/trench%20foot (accessed Aug. 13, 2024).

the Agency. Mother and Father were granted supervised visitation with the children.

{¶ 4} The Agency created a case plan for Mother's and Father's reunification with the children, and this plan was adopted by the juvenile court. The case plan required Mother and Father to each complete psychological evaluations and follow through with all recommendations, obtain and maintain stable housing and income sufficient to meet the needs of the children, complete parenting classes and demonstrate learned skills, cooperate with the Agency, sign all releases giving the Agency access to certain records, and attend the children's medical appointments.

{¶ 5} Mother and Father began to work on the case plan, both undergoing psychological examinations. Mother's evaluation did not result in any diagnoses. Father's evaluation resulted in a bipolar I diagnosis and a recommendation that he engage in therapeutic services one-to-four times a month.

{¶ 6} Initially, Mother and Father consistently exercised weekly visitation with the children at the Agency's "Town Home" visitation center. Father missed visitations near the end of January 2023 and in February 2023 as he was in jail after violating the terms of his probation on an underlying theft charge. When Mother and Father visited the children, they brought Father's dog to the visits. The dog, a chihuahua-beagle mix, is Father's therapy dog, though it is not a licensed service animal. In May 2023, after an incident where the dog made other families at the visitation center uncomfortable, Mother and Father were told they could no longer bring the animal to visitations. This led to an angry and aggressive outburst by Mother and Father. In addition to both parents yelling at Agency case aides, Mother also made a crude hand gesture towards the aides and threw a 2-liter pop bottle at a car. Mother's and Father's visitations with the children were suspended after this event. The visitations were not reinstated until the end of September

2023. Shortly thereafter, at the beginning of October 2023, the juvenile court adopted a modification to Mother's and Father's case plan to add the requirement that Mother and Father complete anger management.

{¶ 7} Once Mother's and Father's visitations restarted, Mother and Father chose to break the two-hour visitations into one-hour increments, with one parent visiting with the children for an hour while the other parent sat outside with the dog. They would then switch places so that the other parent had an hour of visitation with the children. The parents employed this method of visitation for a period of time. However, near the end of November 2023, Father decided to stop visiting the children.

{¶ 8} On November 13, 2023, the Agency moved for permanent custody of My.B., Me.B, and T.B. A hearing on the Agency's motion was scheduled for February 12, 2024. Prior to the hearing, on January 29, 2024, the CASA filed a report recommending that the Agency be granted permanent custody of the children.

{¶ 9} At the permanent custody hearing, the juvenile court heard testimony from the Agency supervisor assigned to the family's case (the "Agency supervisor"), the children's CASA, Mother, and Father. The Agency supervisor testified that she has been assigned to the family's case since July 2023. After describing the circumstances that led to the Agency's involvement—the family's homelessness, the family's need for medical attention, the children being unenrolled from school for over three years, and the children being unable to answer personal questions about themselves—the supervisor discussed the progress the children had made while in foster care. At the time of the hearing, My.B. was 17 years old, Me.B. was 15 years old, and T.B. was 14 years old. When the children were initially removed from Mother's and Father's care on June 30, 2022, they were placed in group homes, with T.B. being placed in a separate group home

than his sisters. However, in July 2022, the children were placed in a foster home together. The children have remained in this foster home throughout the pendency of the case. Though their current foster parents do not wish to adopt the children, the foster parents are willing to be a permanent placement for the children until they turn 18 years old. All three of the children have an independent living plan as part of the Agency's case plan.

{¶ 10} At the time the Agency became involved with the family in June 2022, the children had not been to school in over three years. Records revealed the children had been disenrolled from a school in California in November 2018. The only other record of them attending school was an online enrollment into Ohio Virtual Academy, which occurred on January 8, 2020. However, they were disenrolled later that month due to nonattendance. Once placed in the Agency's temporary custody, the children were re-enrolled in school. Though the children were educationally behind their peers and Me.B and T.B. had to be placed on individualized education programs, the children are now doing well in school. My.B. attends a technical school where she takes E.M.T. classes and is preparing for real-world experiences. Me.B. is an honor student, has been named student of the month, and participates in color guard. T.B. is also doing great in school and was recently recognized as "student of the quarter." My.B. and Me.B. both see a school counselor.

{¶ 11} The Agency supervisor testified that Mother and Father had made limited progress on the case plan and had failed to remedy the conditions that led to the children's removal. Both Mother and Father had undergone a psychological assessment, with Father receiving a bipolar I diagnoses. Father had also reported an earlier diagnosis of a dissociative disorder. Though it was recommended that Father engage in therapeutic

services one-to-four times a month, the Agency was never able to verify that Father engaged in such services. Father claimed to be in counseling, but he refused to tell the Agency the name of his therapeutic provider or how often he received treatment.

{¶ 12} Neither Mother nor Father had enrolled in or completed parenting classes or anger management. Mother informed the Agency that she does not have time for case services. Neither Mother nor Father have attended or made efforts to attend the children's medical appointments or counseling sessions. They also do not regularly communicate with the Agency, despite the Agency making multiple attempts each month to contact them.

{¶ 13} Mother and Father had not obtained stable housing and had not demonstrated they could financially support a family of five. Though the Agency provided Mother and Father with resource guides meant to help them find suitable housing, Mother and Father remained homeless. Mother and Father stayed in tents, various hotels, and an RV that was given to them. The RV lacked running water and electricity and was not always in working condition. When the RV broke down and had to be repaired, Mother and Father stayed in a hotel room for two months. Mother and Father did not communicate with the Agency about where they were staying and, at times, refused to tell the Agency where the RV was parked.

{¶ 14} Mother and Father claimed to be searching for a home or apartment to rent and indicated they were on various waiting lists. Mother's and Father's efforts to obtain a rental unit are hindered by the fact that they have previously been evicted and they refuse to live anywhere that will not accept Father's dog. The presence of the dog has also prevented Mother and Father from staying at various shelters, as the shelters do not allow animals.

{¶ 15} Mother has held multiple jobs throughout the life of the case, working at Wendy's, Frisch's, Kroger, and Subway. Mother was fired from a couple of those jobs and voluntarily left the other jobs in search of higher pay. Mother never provided the Agency with verification of her income but she claimed to make $10 an hour at Subway, her most recent place of employment. Mother takes an Uber to and from work. She pays for the Uber with gift cards that were provided to her by family members. Mother pays $225 in child support every two weeks. Father has not been employed throughout the life of the case, though he does receive approximately $1,057 in social security disability income each month due to a spinal cord injury.

{¶ 16} The Agency supervisor discussed Mother's and Father's visits with the children, noting that other than when visits were suspended from May 2023 until September 2023, Mother has regularly visited the children. Mother's visits with the children go well, although there are times where Mother maintains focus solely on My.B. rather than sharing focus equally between all three children. Outside of the supervised visitations at the Agency's Town House, Mother has contact with My.B. via phone calls and video calls. She also uses Snapchat to communicate with My.B.

{¶ 17} Father's last visit with the children occurred on November 27, 2023. Father voluntarily stopped attending visits without notifying the Agency. He has not had any contact with the children since then. He has not engaged in video calls, phone calls, or sent correspondence to the children. The supervisor opined that when Father did visit the children, he had more of a "friend relationship" with the children.

{¶ 18} The supervisor testified that throughout the life of the case, the Agency attempted to find family members with whom they could place the children. Efforts were made to place the children with a maternal aunt, paternal grandparents, and a paternal

aunt. While paternal grandparents and paternal aunt began proceedings to undertake custody of the children, they both later withdrew their applications. No other viable family or kinship members were available to take custody of the children.

{¶ 19} The children's CASA testified that she has been involved in the case since July 2022. She noted that the children are doing "excellent" and have adjusted well in their current foster home and respective schools. She testified that My.B. wants to stay in her current foster home and finish high school and opined that both Me.B. and T.B. are adoptable. The CASA noted that Mother and Father were aware of what was required of them under the case plan and that she had encouraged them to take parenting classes online. Mother told the CASA, "I don't need to take parenting classes. They're teenagers. That's for people with younger kids." At no point in time did Mother or Father indicate transportation issues prevented them from accessing case plan services. It was the CASA's opinion that it was in the children's best interests for permanent custody to be granted to the Agency due to Mother's and Father's lack of progress in completing case plan services.

{¶ 20} Mother testified about her lack of progress in completing case plan services. She indicated she has not been able to complete case plan services because she was too busy working and earning money for the family. Mother testified that she works six days a week at Subway and that she has successfully paid off some eviction judgments that had been rendered against her. Mother also testified that she has been searching for an apartment to rent and has put her name on five different waiting lists for a two-bedroom apartment. For the past two months, she and Father have been living at a hotel because their RV needed repairs.

{¶ 21} Mother also indicated that she has not completed parenting classes and

anger management because she did not know how to access the services. According to Mother, she never received papers on "who to call or where to go." Although Mother knew she could take the parenting classes online, she stated the cost prevented her from taking them. However, on cross-examination, she indicated she did not know how much they cost.

{¶ 22} Mother testified that she exercises her visitation every week and has done so except when visitations were suspended. In addition to providing meals for the children at visitation, she also buys the children gifts, such as candy, toys, Christmas presents, and Valentine's Day presents. Mother testified she most recently spent $200 on Valentine's gifts for the children.

{¶ 23} On cross-examination, Mother admitted that "nothing has changed" since the children were removed from her and Father's care in 2022. Despite her working and Father contributing his social security disability funds, she and Father are still homeless and do not earn enough money to support a family of five.

{¶ 24} Father testified that after his psychological evaluation, he engaged in counseling services at Butler Behavioral Health. He claims he has been attending sessions two-to-four times a month, though he could not recall his counselor's name and the Agency never received any reports indicating that he was participating in counseling. Father indicated his counselor had recently retired and he was planning to engage in online meetings. In addition to meeting with a counselor at Butler Behavior Health, Father claims he is working with a social worker at Butler Behavior Health to learn how to budget finances and save money. Father travels to his counseling appointments by using an Uber or having a friend drive him.

{¶ 25} Father testified that he has not been employed throughout the life of the

case but he receives over $1,000 a month in social security disability income. He indicated he was also trying to find a job but has had trouble finding anything as a result of his felony theft conviction. He stated he has applied for approximately ten jobs but has not been hired at any of those places. The majority of Father's income is used to pay for lodging at the hotel where he and Mother are currently staying.

{¶ 26} Father admitted he has not completed parenting classes or anger management. Regarding parenting classes, Father indicated he had not taken them because "it's financial and normally [Mother] takes care of all communications with us." He has not engaged in anger management courses because he believes he does not "really have anger issues."

{¶ 27} Father testified that he has not visited with the children since November 2023 because he lost his dog sitter and cannot take the dog with him. Although the dog was described as well-behaved and well-trained, Father would not consider leaving the dog at the hotel by itself to attend the visits because, "the dog means everything to me" and "I don't want to leave her." According to Father, the dog recently became his registered therapy dog.

{¶ 28} On cross-examination, Father admitted that "nothing has changed" since the children were removed from his and Mother's care in 2022. According to Father, "[w]e're still kind of in the same boat but we're almost . . . getting out of it."

{¶ 29} On March 14, 2024, after considering the foregoing testimony, the juvenile court issued a decision granting the Agency's motion for permanent custody of the children. The court found that the children had been in the Agency's custody for 12 or more months of a consecutive 22-month period and that the children could not be placed with Mother or Father within a reasonable time period and should not be placed with them.

After considering the best interest factors set forth in R.C. 2151.414(D)(1), the court determined that My.B., Me.B., and T.B. were in need of legally secure permanent placement, which could only be achieved with a grant of permanent custody to the Agency. The court noted that

> [n]either parent has completed all of the case plan services. Neither Mother nor Father can provide adequate housing for the Children. That was the primary issue at the beginning of this case and 19 months later, it continues to be the case now. Neither Mother nor Father is in a position to take care of the Children.
>
> . . .
>
> Here, the evidence clearly and convincingly shows that the problems that led to the Children's removal have not been substantially remedied.

{¶ 30} Mother and Father separately appealed the juvenile court's decision, each raising a single assignment of error. For ease of discussion, we will address the assignments of error together.

{¶ 31} Mother's Assignment of Error:

{¶ 32} THE JUVENILE COURT'S DECISION TO GRANT PERMANENT CUSTODY TO [THE AGENCY] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND FAILED TO MEET THE CLEAR AND CONVINCING STANDARD.

{¶ 33} Father's Assignment of Error:

{¶ 34} THE TRIAL COURT ERRED IN FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT THE BEST INTEREST OF THE CHILDREN, PURSUANT TO THE FACTORS SET FORTH IN R.C. 2151.414(D), WAS REACHED BY GRANTING PERMANENT CUSTODY TO [THE AGENCY].

{¶ 35} Mother and Father challenge the juvenile court's decision to grant permanent custody of the children to the Agency, contending that the decision was

against the manifest weight of the evidence and that there was not clear and convincing evidence presented demonstrating that permanent custody was in the children's best interests.

{¶ 36} Before a parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state must prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 2015-Ohio-4315, ¶ 11 (12th Dist.), citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982). Under R.C. 2151.414(B)(1), a juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re G.F.*, 2014-Ohio-2580, ¶ 9 (12th Dist.); *In re A.M.*, 2020-Ohio-5102, ¶ 18. First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors set forth in R.C. 2151.414(D). *In re D.K.W.*, 2014-Ohio-2896, ¶ 21 (12th Dist.); R.C. 2151.414(B)(1). Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. *In re C.B.*, 2015-Ohio-3709, ¶ 10 (12th Dist.). Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re H.G.*, 2023-Ohio-4082, ¶ 58 (12th Dist.).

{¶ 37} "Because R.C. 2151.414 requires that a juvenile court find by clear and

convincing evidence that the statutory requirements are met, 'the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination . . . . '" *In re E.V.*, 2024-Ohio-192, ¶ 25 (12th Dist.), quoting *In re Z.C.*, 2023-Ohio-4703, ¶ 11.[3] Sufficiency of the evidence is a test of adequacy to determine if the evidence is legally sufficient to sustain a decision, while weight of the evidence relates to the issue of persuasion and the effect of the evidence in inducing belief. *In re Z.C.* at ¶ 13; *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. "Although sufficiency and manifest weight are distinct legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re B.O.*, 2024-Ohio-1732, ¶ 37 (12th Dist.), citing, *In re L.B.*, 2020-Ohio-3045, ¶ 29 (10th Dist.).

**{¶ 38}** In determining whether a juvenile court's decision to grant a motion for permanent custody is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley* at ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the [decision]." *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.).

---

3. "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

**{¶ 39}** With respect to the second part of the two-part permanent custody test, the juvenile court determined that My.B., Me.B., and T.B. had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d) and that the children could not be placed with Mother or Father within a reasonable time or should not be placed with either of them pursuant to R.C. 2151.414(B)(1)(a). Neither Mother nor Father contest the juvenile court's 12 of 22 determination, and the record reflects that the children have been in the Agency's custody since being removed from Mother's and Father's care on June 30, 2022.[4] Mother seeks to challenge the trial court's alternative finding—that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. However, as noted above, only one of the R.C. 2151.414(B)(1) findings must be met to satisfy the second prong of the two-part permanent custody test. *In re H.S.*, 2023-Ohio-4082 at ¶ 58. Because the juvenile court's "12 of 22" finding satisfies the second prong of permanent custody test, we need not consider Mother's arguments relating to the court's alternative finding that the children could not be placed with either parent within a reasonable time. The issue is moot. *See In re J.N.L.H.*, 2022-Ohio-3865, ¶ 26 (12th Dist.); *In re C.P.*, 2022-Ohio-3320, ¶ 27.

**{¶ 40}** The only issue remaining is whether an award of permanent custody to the Agency was in the children's best interest. When considering the best interest of a child in a permanent custody case, the juvenile court is required under R.C. 2151.414(D)(1) to

---

4. With respect to the 12 of 22 provision, temporary custody is deemed to begin on the date that the child is adjudicated as abused, neglected, or dependent or 60 days after the child's removal from the home, whichever occurs earlier. R.C. 2151.414(B)(1)(d); *In re S.H.*, 2015-Ohio-1763, ¶ 21 (12th Dist.). My.B., Me.B., and T.B. were removed from their parent's home on June 30, 2022. By operation of R.C. 2151.414(B)(1)(d), temporary custody is deemed to begin 60 days after their removal, or on August 29, 2022, rather than on the later date of adjudication, which occurred on August 31, 2022. Therefore, at the time the Agency moved for permanent custody on November 13, 2023, the children had already been in the Agency's temporary custody for more than 14 months.

consider all relevant factors. *In re D.E.,* 2018-Ohio-3341, ¶ 32 (12th Dist.). These factors include, but are not limited to: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.C.,* 2018-Ohio-1687, ¶ 22 (12th Dist.), citing R.C. 2151.414(D)(1)(a) thru (e). The factors in R.C. 2151.414(E)(7) through (11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived in the parent's household; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re A.M.*, 2020-Ohio-5102 at ¶ 19.

**{¶ 41}** The record reflects that the court considered the best interest factors set forth in R.C. 2141.414(D) and found that it was in My.B.'s, Me.B.'s, and T.B.'s best interest to grant permanent custody to the Agency. Mother and Father challenge the court's finding, arguing that the court failed to give sufficient weight to the bond and relationship the children have with them and the steps they have taken to secure housing, which included paying down eviction judgments and putting their names on apartment waiting lists. Both Mother and Father believe the Agency could have done more to reunify them with their children, especially as it relates to assisting with housing.

{¶ 42} After our review of the record, we find no merit to Mother's or Father's arguments. The juvenile court's determination regarding the best interest of My.B., Me.B., and T.B. is supported by clear and convincing evidence and was not against the manifest weight of the evidence. While evidence was presented that Mother, Father, and the children are bonded with one another and interact well during visitations, neither Mother nor Father's visitations ever progressed beyond supervised visitation. Though Mother regularly attends visitations, Father voluntarily stopped visiting the children near the end of November 2023. He did so because he would rather stay home with his dog, who he stated, "means everything to me." He has not had any contact with the children since then.

{¶ 43} The bond Mother and Father share with the children is but one factor in the best interest test, and "no one factor [in the best interest test] is entitled to more weight than the other factors." *In re A.C.*, 2023-Ohio-836, ¶ 54 (10th Dist.), citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56. In addition to considering the children's relationship with Mother and Father, the court also considered the children's custodial history, their current living situation, their relationship with the foster family, and their wishes, as expressed to the CASA. The children have been in the Agency's temporary custody since being removed from Mother's and Father's care on June 30, 2022. They spent less than a month in group homes before being placed in their current foster placement in July 2022. By all accounts, the children are doing well in their current placement. They have made significant strides in their schooling, despite the three-year gap in their education. The children discussed their custodial wishes with the CASA, indicating they were relieved to be able to attend school and no longer be homeless and they were very happy in their foster home. My.B. indicated her desire to remain in her current foster placement until she graduates from

high school.  The foster parents have indicated their willingness to be a permanent placement for the children until they turn 18.

{¶ 44} The juvenile court also considered Mother's and Father's progress on case plan services, the children's need for a legally secure placement, whether such placement could be achieved without a grant of permanent custody to the Agency, and whether Mother and Father had remedied the conditions that led to the children's removal from the home.  The record reflects that Mother and Father made very little progress on their case plan services other than completing a psychological assessment.  Though Father claimed he was engaging in therapeutic services following his bipolar I diagnosis, Father never informed the Agency of his therapeutic provider or the frequency of his services.  He was also unable to recall the name of his counselor when questioned at the permanent custody hearing.

{¶ 45} The evidence presented at the hearing established that neither Mother nor Father had completed or even begun parenting classes or anger management.  Father denied that he had anger issues and needed anger management treatment.  Mother did not feel she or Father needed to take parenting classes, as the children were teenagers and she felt parenting classes were for "people with younger kids."  Though Mother indicated at the permanent custody hearing that it was the cost of parenting classes that prevented her from taking them, she never expressed this to the CASA or Agency supervisor.  Mother also did not know what cost, if any, was associated with taking an online parenting class when asked.  As the juvenile court noted, "[t]he [c]hildren are not a priority in [Mother's and Father's] lives, as evidenced by their lack of full compliance of case plan services."

{¶ 46} Evidence was also presented demonstrating that the parents did not make

an effort to attend the children's medical appointments or counseling sessions. Though the children are healthy now, T.B. once had significant dental problems that required multiple appointments and procedures. Mother and Father never attended those appointments. Mother and Father also never attempted to attend the children's counseling appointments or follow up on their care.

{¶ 47} Mother and Father failed to obtain stable housing or demonstrate sufficient income to meet the needs of the children throughout the life of the case. Despite the parents' combined income from Mother's job and Father's social security disability, Mother and Father could not provide food, clothing, shelter or other basic necessities for the children. As of the date of the permanent custody hearing, which was more than 19 months after the Agency first became involved in the case, Mother and Father were still homeless, staying at hotels, in a tent, or in an RV that often broke down and lacked running water and electricity. Though Mother claims that she is working towards obtaining housing by paying down debt incurred from past evictions and by putting her name on various waiting lists to rent a two-bedroom apartment, the fact remains that neither she nor Father have demonstrated they can provide a stable, safe home for the children.[5]

{¶ 48} Mother and Father suggest that the Agency should have done more to help them find housing during the pendency of the case. We find no merit to this argument. The record reflects that the Agency made reasonable efforts to reunify the family and assist Mother and Father in finding housing. See R.C. 2151.419(A)(1) (requiring that a

---

5. We note that Father filed a letter with this court on July 31, 2024, contending that his and Mother's financial circumstances have improved and that they are now able to provide stable housing for the children. However, "as an appellate court, our review is strictly limited to the record before us and we cannot consider matters or facts that are outside the record or were not part of the trial court proceedings." *Whitling v. Whitling*, 2017-Ohio-8197, ¶ 16 (12th Dist.). For this reason, Father's letter was struck and was not considered by this court in rendering our decision. *See In re M.B., et al.*, Warren No. CA2024-03-009 (Aug. 6, 2024) (Entry Striking Letter filed by Appellant, [Father], on July 31, 2024).

juvenile court determine whether reasonable efforts have been made to reunify the family before a parent's parental rights may be terminated). We note that "reasonable efforts" does not mean all available efforts. *In re M.G.*, 2023-Ohio-1316, ¶ 39-40 (12th Dist.); *In re E.S.*, 2021-Ohio-345, ¶ 70 (12th Dist.). "Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re K.B.*, 2015-Ohio-2732, ¶ 50 (12th Dist.). "When examining whether a children services agency made reasonable efforts to reunify a family, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute." *In re T.P.*, 2016-Ohio-72, ¶ 29 (12th Dist.). Here, the record reflects that the Agency made reasonable efforts to reunify Mother and Father with the children through the creation of the case plan which offered of a multitude of services which Mother and Father did not engage in leading up to the permanent custody hearing. As it relates to housing specifically, the record reveals that the Agency provided Mother and Father with resource guides on suitable housing. The Agency also recommended shelters where Mother and Father could stay until they got on their feet financially, so that money did not have to be spent on hotel rooms. Mother and Father elected not to pursue those shelters, as they did not allow pets and Father refused to stay anywhere without his dog. Mother and Father chose to prioritize the needs of their dog over the children's need for a stable home.

{¶ 49} Despite opportunities to do so, Mother and Father have not shown over the history of the case that they are committed or able to care for the children. Based upon the evidence presented at the hearing, it is clear that Mother's and Father's lack of commitment to the case plan and their failure to put their children's needs ahead of their own have prevented Mother and Father from providing the children with a safe and stable

living environment. At the permanent custody hearing, both Mother and Father admitted that in the nineteen months that had passed since the Agency's first became involved with the family, "nothing has changed." Mother and Father are still homeless, their financial circumstances have not improved, and they are unable to provide basic necessities for the children. As the juvenile court noted, the children are in need of legally secure permanent placement, and "[n]either Mother nor Father is in a position to take care of the [c]hildren."

{¶ 50} As this court has previously recognized, "'[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 2022-Ohio-3101, ¶ 45 (12th Dist.), quoting *In re D.E.*, 2018-Ohio-3341 at ¶ 60. The juvenile court's decision granting permanent custody to the Agency provides this for the children. Accordingly, we find that the juvenile court's decision to grant permanent custody of My.B., Me.B., and T.B. to the Agency was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Mother's and Father's assignments of error are overruled.

{¶ 51} Judgment affirmed.

BYRNE, P.J. and M. POWELL, J., concur.