[Cite as *In re B.T.*, 2025-Ohio-3019.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

|  |  |  |
|---|---|---|
| IN RE: | : | |
| B.T., et al. | : | CASE NOS. CA2025-03-024<br>CA2025-03-025 |
| | : | |
| | : | OPINION AND<br>JUDGMENT ENTRY<br>8/25/2025 |
| | : | |
| | : | |

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 20223013; 20223014

Holly Simpson, for appellant.

Brian Shidaker, Clinton County Prosecuting Attorney, and Danielle E. Sollars, Assistant Prosecuting Attorney, for appellee.

Melissa A. Berry, for father

Sandy Bigley, for CASA.

─────────────
**O P I N I O N**
─────────────

**M. POWELL, J.**

{¶ 1}   Appellants, the biological mother ("Mother") and father ("Father") of J.C. ("Jane") separately appeal a decision of the Clinton County Court of Common Pleas, Juvenile Division, granting permanent custody of their daughter Jane to Clinton County Children Services ("the Agency").[1] Mother also appeals the decision of the juvenile court granting permanent custody of her son B.T. ("Brian") to the Agency.[2] Brian and Jane were born in November 2006 and October 2014, respectively. Brian's father is not a party to this appeal and was uninvolved in the proceedings below.

{¶ 2}   At the outset, we decline to address Mother's appeal regarding Brian because we find that the juvenile court lacked jurisdiction to grant the Agency permanent custody of Brian. The jurisdiction of the juvenile court over abused, neglected, or dependent children is controlled by R.C. 2151.353(F)(1), which provides:

> The court shall retain jurisdiction over any child for whom the court issues an order of disposition pursuant to division (A) of this section or pursuant to section 2151.414 or 2151.415 of the Revised Code until the child attains the age of eighteen years . . . , except that the court may retain jurisdiction over the child and continue any order of disposition under division (A) of this section or under section 2151.414 or 2151.415 of the Revised Code for a specified period of time to enable the child to graduate from high school or vocational school. The court shall make an entry continuing its jurisdiction under this division in the journal.

{¶ 3}   R.C. 2151.353(F)(1) is read very narrowly by appellate courts. *In re K.M.N.*, 2021-Ohio-2947, ¶ 5 (2d Dist.); *In re M.*, 2004-Ohio-3798, ¶ 9 (6th Dist.). The statute allows a juvenile court to retain jurisdiction over an abused, neglected, or dependent child

---

1 . Pursuant to App.R. 3(B), we sua sponte consolidate these appeals for purposes of writing this single opinion. *See In re B.O.*, 2024-Ohio-1732, ¶ 1, fn. 1 (12th Dist.).

2 . "Jane" and "Brian" are pseudonyms, adopted in the opinion for purposes of privacy and readability. *In re A.M.*, 2023-Ohio-1523 (12th Dist.); *The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d. Ed. 2024).

beyond the child's 18th birthday to *continue* a prior order of disposition. The statute does not allow the juvenile court to retain jurisdiction over the child beyond the child's 18th birthday to issue new or additional orders of disposition. Brian turned 18 on November 21, 2024, was a senior in high school, and was expected to graduate in the spring of 2025. On the eve of Brian's 18th birthday, the juvenile court issued an entry finding that it was "in Brian's best interest to continue in the Agency's custody beyond the date of his 18th birthday until he graduates from high school or until further orders from this Court." The only dispositional order in place at that time was the juvenile court's April 15, 2024 entry granting temporary custody of the children to the Agency for a second time. Thus, pursuant to R.C. 2151.353(F)(1), the juvenile court was allowed to retain jurisdiction over Brian to continue the April 15, 2024 temporary custody dispositional order to enable Brian to graduate from high school. R.C. 2151.353(F)(1), however, did not allow the juvenile court to retain jurisdiction over Brian beyond his 18th birthday to enter a new order of disposition, to wit, its February 18, 2025 decision granting permanent custody of Brian to the Agency. We therefore find that the juvenile court had no authority to issue its permanent custody decision regarding Brian and we hereby vacate the court's February 18, 2025 decision granting permanent custody of Brian to the Agency. We will hereinafter refer to Brian only as necessary in setting forth the facts of the case.

{¶ 4} The Agency became involved with the family in October 2021 after learning that Brian, then almost 15 years old, was not attending school regularly and that seven-year-old Jane was not enrolled in school. The Agency worked informally with the family for a few months and closed the case on January 6, 2022, after Brian's attendance improved and Jane was enrolled in school. However, the Agency opened a new investigation on January 12, 2022, upon learning that Jane had excessive absences and

- 3 -

tardies and that Brian had a truancy case before the juvenile court. On March 9, 2022, the Agency filed a complaint alleging that the children were dependent and neglected. The juvenile court placed the children in the protective supervision of the Agency and appointed a Court Appointed Special Advocate ("CASA")/Guardian ad Litem ("GAL") for the children. The State agrees that the CASA acted as a guardian ad litem throughout the proceedings, and therefore this opinion will refer to this individual as the GAL.

{¶ 5} The children were adjudicated dependent on May 18, 2022. The children initially remained in Mother's custody under the Agency's protective supervision. Mother began testing positive for methamphetamine in the summer of 2022. As a result, a safety plan was put into place pursuant to which the children resided with a maternal aunt.[3] The safety plan was violated in August 2022 when Mother came to the courthouse with Brian unsupervised. It was again violated in January 2023 when the Agency received information that Father was living at the maternal aunt's residence despite a no-contact order between Father and Mother. As a result, the juvenile court granted temporary custody of the children to the Agency on January 6, 2023. Jane was placed in a kinship care with a different maternal aunt, and Brian was placed at the home of his coach. Both placements disrupted and the children were placed together in the care of long-time friends of Mother ("Friends"). In January 2024, the juvenile court terminated the Agency's temporary custody and granted Friends temporary custody of the children.[4] However, this

---

3. The record contains scant details about the safety plan. A report filed by the GAL in September 2022 indicates that the safety plan was put into place on August 5, 2022.

4. In its entry granting permanent custody of Jane to the Agency, the juvenile court refers to the placement with Friends as a kinship placement. R.C. 2151.011, the definitions statute, does not define kinship. The term "kinship caregiver" is however defined in the Kinship Caregiver Law, set forth in R.C. 2151.4115 through 2151.4122, which became effective on September 30, 2021. The Act requires a public children services agency to "make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in [the] [t]emporary custody of the agency." R.C. 2151.4116(A). A "kinship caregiver" includes individuals related to the child by blood or adoption as well as "[a]ny nonrelative adult that has a familiar and long-standing relationship or bond with the child or the family, which relationship

placement ended in April 2024 when Friends indicated they were unable to care for the children on a long-term basis. On April 15, 2024, the juvenile court terminated Friends' temporary custody and granted temporary custody of the children to the Agency for a second time. The children were placed together in a foster home where they remained for the duration of the case.

{¶ 6} The Agency implemented a case plan for Mother in May 2022. The case plan required Mother to receive treatment for mental health and substance abuse and obtain and maintain stable employment and housing, and for Brian to attend school. Over the course of the case, the case plan was updated six times for the following reasons: to reflect the four changes in placement for the children; to address domestic violence after Mother revealed that Father had head-butted her on October 26, 2022; and to add Father to the plan in March 2023.

{¶ 7} Father's initial case plan required him to obtain full-time employment, to complete a mental health assessment and follow through with all recommended treatments, to obtain housing as he had been homeless for several months, and to complete the domestic violence OCEPI workbook in light of the head-butting incident. A later case plan, filed in July 2024, required Father to complete the OCEPI workbook, to engage in mental health services and follow through with all recommended treatments, and to obtain independent housing. The case plan noted that Father was currently residing with Mother "who continues to test positive for illegal substances. There have been previous concerns of domestic violence between the two of them."

{¶ 8} On May 23, 2024, the Agency moved for permanent custody of the children.

---

or bond will ensure the child's social ties." R.C. 2151.4115(A)(1) (adopting the definition of "kinship caregiver" in R.C. 5101.85 for application to R.C. 2151.4116 through 2151.4122). Mother and Father did not raise the Kinship Caregiver Act below or on appeal.

A hearing on the motion was held on October 1, 2024. Throughout the case, the GAL filed multiple reports. Her final report, filed a week before the permanent custody hearing, recommended granting permanent custody of the children to the Agency. During the permanent custody hearing, the juvenile court heard testimony and took evidence from the Agency's ongoing caseworker for the family, Mother, Father, the GAL, and Jerome "Pete" Reed, a certifying scientist from Forensic Fluids Laboratories, Inc. Forensic Fluids is a toxicology laboratory located in Kalamazoo, Michigan that conducted oral fluid drug testing for the Agency during the course of the case. The record shows that the caseworker was assigned to the case in September 2023. He was the family's fifth caseworker since October 2021 when the Agency first became involved with the family.

{¶ 9} Testimony revealed that both Mother and Father completed the domestic violence OCEPI workbook, that they were residing together in Mother's home, that Father was fully employed and earning $40,000-50,000 a year, that Father had neither substance abuse issues nor a criminal record, and that there is a mutual loving bond between the children and the parents. Testimony also revealed the following.

**Employment**

{¶ 10} Although Mother was employed on and off throughout the case, she testified that she lost her job in July 2023 and that she was selling her belongings, working on cars, and working for DoorDash to pay her rent. Mother admitted she did not have a driver's license as it had been suspended. Mother stated that she was looking for a job, that she had submitted multiple applications, and that she could not financially support the children "if they came home today." During his testimony, Father explained he was the one driving when Mother was delivering for DoorDash.

**Housing**

{¶ 11} Mother has lived in her current home since at least September 2023. The lease is under her name. By the time of the permanent custody hearing, Father had been living with Mother for about a year. Father testified that despite his full-time employment earning $40,000-50,000 a year, his lack of a criminal record, and multiple costly applications, he had been unable to find appropriate and affordable housing separate from Mother and as a result, had requested assistance from the Agency. The record indicates that the Agency provided Father limited assistance by having him sign an Emergency Service Allocation form in late summer 2024 and that there was no follow up. Testimony shows that Mother offered several times to move out of her home so that Father could complete the housing requirement of his case plan, but to no avail. The caseworker testified that housing was the only outstanding concern regarding Father, that his living with Mother prevented reunification because of Mother's substance abuse issues, and that in any event reunification was no longer the Agency's goal for the case.

**The Caseworker's and GAL's Contact with Mother and Father**

{¶ 12} The caseworker testified that his last successful home visit was in late June 2024 and that he last saw Mother and Father during a court hearing in late July 2024. Thereafter, the caseworker tried several times to contact Mother and visit her home by calling and texting her, by making unannounced visits to the home, and by leaving notices on the door with both parents' names. However, Mother never answered the door or replied to his texts. Although the caseworker testified he would call or text both Father and Mother before June 2024 to schedule a home visit, he only texted Mother after June 2024. He provided no explanation as to why he stopped contacting Father after June 2024. The caseworker also testified that unannounced home visits qualified for both Mother and Father and that they took place between 2:30 p.m. and 5:00 p.m. even though

he knew Father was not home until after 5:30 p.m. due to Father's work schedule.

{¶ 13} Father testified that although the Agency has his email and cellphone contact information, it does not contact him. Father confirmed that he does not come home from work until 6:00 p.m., hence after the attempted home visits.

{¶ 14} The GAL's testimony solely referred to her attempts at contacting Mother and visiting the home. The GAL testified that she had not spoken to Mother in a year, that she last saw the children with Mother when they all lived with her sister under the safety plan, that she went to Mother's home a couple of times but no one answered the door, and that she stopped trying to contact Mother after that.

**Visitation**

{¶ 15} Mother visited frequently but not consistently with the children at the Agency. Her last visit was on May 14, 2024. That day, Mother arrived late, was told the visit had been cancelled, and allegedly told another parent in the parking lot that she wanted to "beat up" a case aide. The threatening comment was reported to the Agency and Mother was unable to resume visitation afterward. No charges were filed against Mother. The caseworker testified that Mother was provided with the option to reach out to other agencies' visitation centers in surrounding counties as alternative locations for visitation, that Mother had called these centers, and that Mother was told the centers did not allow visitation for out-of-county individuals. The record indicates this was the extent of the caseworker's efforts in assisting Mother in her attempt to resume visitation with the children. The caseworker also testified he would have advocated to have Mother's visitation reinstated had she been showing progress on her case plan. However, he had not done so because "as far as [he knew], [Mother] was not in counseling" and her last drug test was positive.

{¶ 16} Father visited Jane at the Agency once a week and only missed one visit. It is not clear whether the caseworker ever observed Father's visits with Jane or their interaction. The caseworker reported that the visits "seem to go well. . . . I've not heard anything overly negative or overly positive from the case aides kind of either way." Neither the GAL's testimony nor her many reports indicate she ever observed Father's visits with Jane or their interaction.

**Jane's wishes**

{¶ 17} Throughout the case, the GAL reported that after the children were no longer residing with their maternal aunt under the safety plan, they both expressed their desire to live with Mother in their own home, and Jane further stated she wanted Father to live with them. In her final report, the GAL reported that "[a]lthough both children state they wish they could reunite with their mother, both report feeling happy and safe in the current placement, and both state they wish to remain with the [foster] family." The caseworker testified that although the children care for and love visiting with Mother and Father, they both desire finality. The caseworker also stated that Jane wanted the case to conclude and either go home or be adopted were the Agency to get permanent custody. The foster family did not testify and the Agency did not present evidence that the family was interested in adopting Jane. The juvenile court did not interview the children in-camera but found that the children desire finality.

**Other Concerns of the Caseworker and GAL**

{¶ 18} The main concerns for the caseworker and the GAL were Mother's substance abuse issues, Father's unwillingness or inability to recognize Mother's substance abuse issues, the prior head-butting incident and Mother's allegation she was in a domestic violent relationship with Father, and the belief Mother and Father were so

dependent on one another that Father would likely allow Mother to live with him and the children.

**No-Contact Order**

{¶ 19} The no-contact order was issued on November 30, 2022, a month after the head-butting incident. Father testified the parties accidentally butted their heads when he was gathering his belongings to leave Mother's home at her request. Mother testified Father intentionally head-butted her in the face during a dispute, out of anger. No charges were filed. Father testified he did not become aware of the no-contact order until he appeared before the juvenile court in January 2023, ostensibly because of the second violation of the safety plan. The juvenile court vacated the no-contact order in May 2023. The GAL testified there was no evidence that the children were exposed to domestic violence acts or that they were themselves physically abused.

**Mental Health**

{¶ 20} Father completed a mental health assessment at Talbert House on March 7, 2023. The assessment recommended counseling one to four times a month. The caseworker testified that Father did not follow or agree with the recommendation. The GAL reported that Father lied about the recommendation and did not engage in counseling. Father testified he participated in mental health treatment for a short period of time but stopped attending because they could not accommodate his work schedule. Sometime before the permanent custody hearing, Father completed a new mental health assessment that did not recommend treatment.

{¶ 21} The record indicates that Mother went to Talbert House and later on, to Autumn Behavioral for mental health treatment. Mother testified she went to Talbert House three times over a three-month period, did not miss any appointments, and left the

program because her counselor was leaving. In the first quarter of 2024, Mother went to Autumn Behavioral, attended for a while, and left the program by June 2024. There is no evidence she completed that program.

**Mother's Substance Abuse**

{¶ 22} Mother testified she has been in substance abuse programs and taking Suboxone for the past 15 years. The GAL's first report indicates that Mother became addicted to prescription opioids used to treat chronic pain due to arthritis and fibromyalgia. Mother asserted she started getting positive results for methamphetamine only after the Agency became involved. Mother adamantly denies she uses methamphetamine, and over the course of the case has provided several explanations for the positive results.

{¶ 23} Mother testified that she went weekly to BrightView for substance abuse treatment. While there, she tested positive for methamphetamine four times over a four-month period between June and October 2022. Exhibit 6, BrightView's test results, curiously states that all four samples were collected at a facility at midnight. The same document also shows that Mother tested negative for methamphetamine between February and May 2022, and in January and February 2023. Mother disputed the Agency's position that she was discharged from the program because of poor attendance. A letter BrightView sent to the Agency on May 14, 2023, provides, "Patient's last kept appointment occurred on 3/16/23 and patient doesn't currently have upcoming counseling sessions. Progress reports will be paused moving forward until patient re-engages or is discharged." Mother testified that she left because (1) the juvenile court was repeatedly told there was no proof she was attending and caseworkers had not received the releases of information, and (2) a BrightView counselor had falsified information on the treatment plan and BrightView no longer felt like a safe place. Mother stated that by the time

BrightView sent the letter, she was no longer there and had transferred to Boulder Care, a telehealth substance abuse program.

{¶ 24} The record shows that Mother was tested whenever she appeared before the juvenile court. Mother typically provided a saliva sample via oral swabs, and the samples were sent to Forensic Fluids for testing. Using that method, Mother was tested 22 times between January 2022 and July 2024. One sample was positive for methamphetamine, 14 samples were positive for methamphetamine and amphetamine, and seven samples were negative for those substances. Although Mother has been taking Suboxone on a daily basis for the last several years, six of the 22 samples tested negative for Suboxone. Mother was once found in contempt for refusing to submit to a court-ordered drug screen. At the permanent custody hearing, Mother complained that no one was helping her figure out why she keeps testing positive for methamphetamine, and that she would agree to be tested daily if it meant she could be reunified with Jane. In her quest to figure out why she keeps testing positive for methamphetamine, Mother admitted tampering with the oral swab drug tests by replacing the oral swabs provided by Forensic Fluids with identical oral swabs provided by Boulder Care and providing water instead of saliva.

{¶ 25} There is no evidence the children know about or witnessed Mother's substance abuse, how Mother's substance abuse affected her ability to parent, or how it adversely affected the children's home environment. The evidence related to Mother's substance abuse is most accurately characterized as proving only her status as an active drug user. Father testified that he has no tolerance for drug abuse, that he would not let anyone abuse drugs around the children, and that he has never witnessed Mother do drugs. Father also stated that based upon how methamphetamine typically affects users

(high energy, stripping, acting like a fool), Mother has a complete opposite reaction to it if she is using it (she sleeps a lot).

**Additional Relevant Testimony**

{¶ 26} The caseworker generally stated that two relatives, Mother's first biological child and an aunt living in Kentucky, could be possible placement options. Although the caseworker testified that the children have a good and loving relationship with their oldest sister, the Agency had decided that the older sibling was not a placement option. The caseworker did not provide an explanation. The caseworker further indicated that the Agency had not heard back from Kentucky regarding the ICPC.

{¶ 27} In addition to the concerns listed above, the GAL testified that other concerns included Father's dishonesty about the treatment recommendations following his first mental health assessment. The GAL was not aware that Father had recently completed a mental health assessment and that it recommended no treatment. The GAL also expressed concerns about domestic violence in the home presumably based upon the head-butting incident. Despite this single incident between Mother and Father in their long history together, the GAL characterized the relationship as involving patterns of domestic violence that "would likely reassert themselves" were the family back together, and stated that the home provided by Mother and Father was "very unstable" and one where domestic violence had happened. When asked if it was possible there was no additional domestic violence after the head-butting incident, the GAL flippantly replied, "It's possible that Paris is not in France, but I believe it is there."

{¶ 28} On direct examination, the GAL also stated that Mother "has been unable to meet the children's basic needs." However, when asked about that statement on cross-examination, the GAL (1) disputed making that statement, (2) asserted that Mother "had

not demonstrated the ability to [provide for the basic needs of the children]. I never said that the children's basic needs were not met," (3) once again disputed saying that the basic needs of the children were not met, and (4) stated that her statement in her final report about being "concerned that [Mother] has not demonstrated the ability to provide for the basic needs of the children" could not be crossed out because that statement was true.

{¶ 29} On February 18, 2025, the juvenile court issued an entry granting the Agency's motion for permanent custody. The juvenile court found that Jane had been in the temporary custody of the Agency for 12 of a consecutive 22-month period, and even if Jane had not been in the Agency's temporary custody for 12 of the last 22 months, she could not be placed with her parents within a reasonable period of time or should not be placed with them. The juvenile court further found that granting permanent custody of Jane to the Agency was in the child's best interest.

{¶ 30} Mother now appeals the juvenile court's decision, raising four assignments of error. Father also appeals the juvenile court's decision, raising two assignments of error. This court consolidated the appeals for review and disposition. For ease of discussion, Mother's second and fourth assignments of error and Father's first assignment of error will be considered together.

{¶ 31} Mother's Assignment of Error No. 2:

THE JUVENILE COURT'S DECISION GRANTING PERMANENT CUSTODY TO THE AGENCY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THERE WAS INSUFFICIENT EVIDENCE TO FIND IN FAVOR OF THE STATE.

{¶ 32} Mother's Assignment of Error No. 4:

GRANTING PERMANENT CUSTODY TO THE STATE IS A VIOLATION OF MOTHER'S CONSTITUTIONAL RIGHTS.

- 14 -

{¶ 33} Father's Assignment of Error No. 1:

THE JUVENILE COURT ERRED AND ABUSED ITS DISCRETION IN FINDING BY CLEAR AND CONVINCING EVIDENCE THAT IT WOULD BE IN THE CHILDREN'S BEST INTEREST TO TERMINATE FATHER'S RIGHTS AND PLACE THE CHILDREN IN THE PERMANENT CUSTODY OF CCCS.

{¶ 34} In the assignments of error above, Mother and Father both argue that the juvenile court's decision granting permanent custody of Jane to the Agency was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 35} The right to parent one's children is a fundamental right. *In re H.G.*, 2015-Ohio-1764, ¶ 30 (12th Dist.), citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000), and *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). Before a parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state bears the burden of proving by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re H.G.* at ¶ 30. Additionally, the state is required to prove that it made reasonable efforts to reunite parent and child during the child-custody proceedings prior to the termination of parental rights. *In re B.C.*, 2014-Ohio-4558, ¶ 26, citing R.C. 2151.419(A)(1). Statutory provisions governing custody matters in R.C. Chapter 2151 are to be liberally construed to provide for the care, protection, and mental and physical development of children whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety. *In re Williams*, 1996-Ohio-182, ¶ 7, citing R.C. 2151.01.

{¶ 36} R.C. 2151.414(B)(1) sets out specific findings a juvenile court must make before granting permanent custody of a child to a children services agency. First, the juvenile court must find that the grant of permanent custody to the agency is in the best

interest of the child, utilizing the factors set forth in R.C. 2151.414(D). *Id.* Second, the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period (commonly known as the "12 of 22 provision"); (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a) thru (e). Only one of these findings must be met to satisfy the second prong of the two-part permanent custody test. *In re B.O.*, 2024-Ohio-1732, ¶ 34 (12th Dist.).

{¶ 37} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re D.P.*, 2020-Ohio-6663, ¶ 13 (12th Dist.). "That is to say, the juvenile court's decision to grant permanent custody must be supported by sufficient evidence." *In re P.E.*, 2023-Ohio-2438, ¶ 14 (12th Dist.). Sufficiency of the evidence tests the burden of production. *In re M.W.*, 2025-Ohio-1968, ¶ 9 (12th Dist.). Whether the evidence is sufficient to sustain the judgment is a question of law. *Id.* Questions of law, even in permanent custody cases, are reviewed by this court de novo. *Id.* In conducting a de novo review, this court independently reviews the record without giving deference to the juvenile court's decision. *Id.*

{¶ 38} In determining whether a juvenile court's decision granting a motion for permanent custody is against the manifest weight of the evidence, an "appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the

witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.*, 2023-Ohio-4703, ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, there is a presumption in favor of the findings made by the finder of fact and evidence susceptible to more than one construction will be construed to sustain the [decision]." *In re M.A.*, 2019-Ohio-5367, ¶ 15 (12th Dist.).

{¶ 39} As stated above, the juvenile court found that Jane had been in the temporary custody of the Agency for at least 12 months of a consecutive 22-month period prior to the Agency filing its motion for permanent custody. *See* R.C. 2151.414(B)(1)(d). The juvenile court also found that Jane could not be placed with Mother or Father within a reasonable time or should not be placed with either of them pursuant to R.C. 2151.414(B)(1)(a). With respect to the 12 of 22 provision, temporary custody is deemed to begin on the date that the child is adjudicated abused, neglected, or dependent, or 60 days after the child's removal from the home, whichever occurs earlier. R.C. 2151.414(B)(1)(d); *In re S.H.*, 2015-Ohio-1763, ¶ 21 (12th Dist.). Here, the earlier date was the date of the dependency adjudication—May 18, 2022. Neither Mother nor Father dispute the juvenile court's 12 of 22 determination, and the court's finding is supported by the record.

{¶ 40} On appeal, Father challenges the juvenile court's determination that Jane could not be placed with him within a reasonable time or should not be placed with him. We need not review this issue, however. *In re R.B.*, 2023-Ohio-3146, ¶ 17 (12th Dist.). As noted above, only one of the R.C. 2151.414(B)(1) findings must be met to satisfy the second prong of the permanent custody test. *Id.* Because the juvenile court found that the

"12 of 22 provision" had been satisfied under R.C. 2151.414(B)(1)(d), its "could not/should not be placed" finding under R.C. 2151.414(B)(1)(a) was unnecessary to grant permanent custody. *In re C.P.*, 2022-Ohio-3320, ¶ 27 (12th Dist.). Because Father does not challenge the juvenile court's "12 of 22" finding, we affirm the juvenile court's decision regarding the second prong of the permanent custody test without conducting any further analysis. *Id.*; *In re J.N.L.H.*, 2022-Ohio-3865, ¶ 26 (12th Dist.).

{¶ 41} As neither Mother nor Father have shown any error related to the second prong of the permanent custody test, we turn our focus to the juvenile court's determination that granting permanent custody to the Agency was in Jane's best interest.

{¶ 42} An agency that seeks permanent custody of a child bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *In re B.C.*, 2014-Ohio-4558, at ¶ 26. Before granting permanent custody, the juvenile court is required to consider all relevant factors under R.C. 2151.414(D)(1). *Id.* These factors include (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) thru (11) apply in relation to the parents and child. *In re J.M.*, 2025-Ohio-1406, ¶ 29 (12th Dist.), citing R.C. 2151.414(D)(1)(a) thru (e). The factors in R.C. 2151.414(E)(7) thru (11) involve a parent's having been convicted of or pled guilty to specific criminal offenses against the child, the child's sibling, or another child who lived

in the parent's household; a parent's withholding of medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated. *In re A.M.*, 2020-Ohio-5102, ¶ 19.

{¶ 43} The juvenile court's February 18, 2025 entry granting permanent custody to the Agency contains 72 items ostensibly listed as findings of fact. We note that a large number of these items are not findings of fact, but rather, are recitations of the evidence presented to the juvenile court, without any statement indicating whether the court believed the testimony presented. *See Smith v. Quigg*, 2006-Ohio-1494 (5th Dist.). The court's entry then identifies the R.C. 2151.414(D)(1) factors the juvenile court considered in determining that an award of permanent custody to the Agency was in Jane's best interest. Specifically, the juvenile court found (1) that Jane was "placed in a foster home where [she is] doing well" and that her visits with Father "go reasonably well," (2) that Jane desires finality, and (3) that Jane has been in the temporary custody of the Agency for 12 of the last 22 months. R.C. 2151.414(D)(1)(a)-(c). The court further found that a legally secure placement could not be achieved without a grant of permanent custody to the Agency. R.C. 2151.414(D)(1)(d). In support of that finding, the court stated it had "considered the length of time that the children have been in care, [Mother's] consistent positive drug tests, the relationship of [Father] and [Mother], and [Father's] lack of acknowledgment [of] [Mother's] ongoing drug use." The juvenile court did not determine whether any of the factors in R.C. 2151.414(E)(7) thru (11) apply to Mother or Father. Finally, in support of its determination that the children could not and should not be placed with Mother or Father, the juvenile court found that "despite reasonable case planning and diligent efforts by the Agency to assist the family, the parents have repeatedly failed

to substantially remedy the conditions that caused the children to be placed outside of the home," and that Mother's chemical dependency is "so severe that it makes the parent unable to provide an adequate permanent home for the children at the present time and, as anticipated, within one year after the [permanent custody] hearing of October 1, 2024." R.C. 2151.414(E)(1) and (2).

**Father's Appeal**

{¶ 44} In his first assignment of error, Father argues that the juvenile court erred in determining it was in Jane's interest to award permanent custody to the Agency. In support, Father emphasizes that he has never wavered in his expressed desire to reunify with Jane, that he has maintained stable employment and housing throughout the pendency of the case, that he regularly visited with Jane and that the two are bonded and care deeply for one another, and that no concerns were ever raised regarding his parenting or substance abuse. Father also argues the juvenile court erred in finding the Agency made reasonable efforts to reunify him with Jane.

{¶ 45} It is undisputed that Father completed the domestic violence OCEPI workbook, that the juvenile court vacated the no-contact order a few months after it was issued, that Father was fully employed and earning $40,000-50,000 a year, that he had no substance abuse issues, that he had no criminal record, that there is a mutual loving bond between him and Jane, and that he visited Jane at the Agency once a week and only missed one visit. As the caseworker testified, Father's failure to secure appropriate housing separate from Mother was by all accounts the only outstanding concern regarding Father and one that prevented his reunification with Jane because of Mother's substance abuse issues. The caseworker also testified that in any event, reunification was no longer the Agency's goal for the case. The juvenile court found that Father had

had ample time to secure alternative housing.

{¶ 46} The record shows that Father spent time, money, and efforts in looking for an affordable and appropriate housing separate from Mother. Father testified that despite his full-time employment earning $40,000-50,000 a year, his lack of a criminal record, multiple weekly costly applications, and expanding his search to several cities, he had been unable to find appropriate and affordable housing separate from Mother. During her testimony, the GAL acknowledged that finding housing was very difficult for everybody. Mother testified that in her efforts to help Father complete the housing requirement of his case plan, she offered numerous times to move out of her home. However, the Agency turned down her offer each time. Consequently, Father requested assistance from the Agency. It responded to Father's request for housing assistance by simply having him sign an Emergency Service Allocation form in late summer 2024, a few months before the permanent custody hearing. There was no follow up or other assistance provided by the Agency.

{¶ 47} Contrary to the juvenile court's finding, the record does not show that the Agency made reasonable efforts toward reunifying Jane with Father. In a permanent child custody matter, the Agency has the responsibility to actively aid the parent so that the children can be returned to the parent. *In re D.D.*, 2023-Ohio-4147, ¶ 27 (10th Dist.). The Agency also has the burden to prove it made reasonable efforts to reunify. *Id.* at ¶ 20. "'Reasonable efforts' does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re M.A.P.*, 2013-Ohio-655, ¶ 47 (12th Dist.). Even so, "[r]easonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a

predicate to reunification." *In re H.M.K.*, 2013-Ohio-4317, ¶ 95 (3d Dist.); *In re D.A.*, 2012-Ohio-1104, ¶ 30 (6th Dist.). The Agency's nominal and inadequate housing assistance hardly qualifies as efforts, let alone reasonable efforts.

{¶ 48} The record also shows that the Agency neither worked around nor accommodated Father's busy work schedule in attempting to see or contact him. Although the caseworker knew that Father was never home from work until after 5:30 p.m., the caseworker consistently made unannounced home visits before 5:00 p.m., leaving a notice on the door without any follow up calls, and stopped contacting Father after June 2024. The caseworker provided no explanation as to why he stopped contacting Father after June 2024. Father's testimony that the Agency does not contact him despite having his email and cellphone contact information was unrebutted.

{¶ 49} We also find that the Agency failed to prove by clear and convincing evidence that granting the Agency permanent custody was in Jane's best interest. In examining the first best interest factor under R.C. 2151.414(D)(1)(a)—the child's relationship with Father and the foster family—the juvenile court found that Jane is doing well in the care of the foster family and that her visits with Father go reasonably well. However, the foster family did not testify at the permanent custody hearing. The finding that Jane's visits with Father go well was based solely upon the caseworker's testimony that the visits "seem to go well" as he had "not heard anything overly negative or overly positive from the case aides kind of either way." Such testimony does not establish that the caseworker observed Father's visits with Jane or their interaction. And as stated above, neither the GAL's testimony nor her many reports indicate or suggest that she ever observed Father's visits with Jane or their interaction.

{¶ 50} Concerning the fourth best-interest factor under R.C. 2151.414(D)(1)(d)—

Jane's need for a legally secure permanent placement and whether that could be achieved without a grant of permanent custody to the Agency—the caseworker generally stated that two relatives, Mother's first biological child and an aunt living in Kentucky, could be possible placement options. Although the caseworker testified that the children have a good and loving relationship with their oldest sister, the Agency had decided that this sibling was not a placement option. The caseworker did not provide an explanation. The caseworker further indicated that the Agency had not heard back from Kentucky regarding the ICPC. There was no evidence of follow up or other steps taken by the Agency in finding and considering appropriate alternatives to permanent custody.

{¶ 51} Although a children services agency must act diligently and use reasonable efforts to assist the parents to remedy their problems as a predicate to reunification, we find that the Agency's actions toward reunification with Father were not "characterized by steady, earnest, and energetic application and effort." *In re D.D.*, 2023-Ohio-4147, at ¶ 27 (10th Dist.). The purpose of R.C. Chapter 2151 is to maintain the family unit whenever possible. R.C. 2151.01. Although the fundamental interest of parents is not absolute, the termination of parental rights is an alternative of last resort, and the parents have no burden to prove that their rights should not be terminated. *In re D.M.*, 2020-Ohio-3273, ¶ 49 (1st Dist.); *In re S.D-M.*, 2014-Ohio-1501, ¶ 33 (9th Dist.).

{¶ 52} While we recognize the importance of permanent placement for children, we are not willing to condone the permanent removal of a child from his or her family without an adequate demonstration of an agency's reasonable efforts and a parent's incapacity to provide adequate parental care. *See In re Fry*, 2002-Ohio-3935 (3d Dist.). The Agency had the burden to prove, by clear and convincing evidence, that termination of Father's parental rights was warranted. The record does not demonstrate reasonable

efforts by the Agency to maintain Jane and Father as a family. The record also fails to show that Father could not provide Jane with a legally secure placement in his home, that is, "a stable environment where a child will live in safety with [a] dependable adult who will provide for the child's needs." *See In re D.M.* at ¶ 55. In light of the evidence presented above, we find that the Agency did not meet its burden in this case. The juvenile court, therefore, erred in finding that terminating Father's parental rights and granting permanent custody of Jane to the Agency was in Jane's best interest.

**Mother's Appeal**

{¶ 53} In her second and fourth assignments of error, Mother argues that the juvenile court erred in finding it was in Jane's best interest to award permanent custody to the Agency because (1) Father or two relatives the Agency was in the process of vetting could or should have qualified as a legally secure placement without an award of permanent custody to the Agency, (2) the juvenile court improperly gave weight to the testimony of Jerome "Pete" Reed, the certifying scientist from Forensic Fluids, (3) Mother substantially complied with her case plan and has always denied using drugs, and (4) the Agency's termination of her visits ensured that she could not regain custody of Jane. We address Mother's expert testimony issue first. The other three issues for review will be considered together.

{¶ 54} In its entry granting the Agency permanent custody of Jane, the juvenile court found Reed's testimony to be credible. At the permanent custody hearing, Reed testified as an expert witness in the field of oral fluid testing. Reed explained the processes used at Forensic Fluids, including sample collection, tracking, initial testing, and confirmation testing, as well as the methods used for eliminating the possibility of false positives. He also explained how Forensic Fluids would indicate whether a sample

appeared to have been tampered with. Reed then testified about the daily calibration and proficiency testing for the equipment used at Forensic Fluids. On cross-examination, Father's counsel asked Reed "if he would be surprised to know that [Forensic Fluids' Director and Reed's supervisor] in previous testimony given to this very Court has said that there are no calibrations run on [the equipment]." Reed replied that his supervisor "wouldn't say that," that he would be surprised if she had, and that his testimony regarding calibration was correct. Reed's cross-examination then ended and the next witness testified.

{¶ 55} In her second issue for review, Mother argues that the juvenile court should not have given weight to Reed's testimony because it directly conflicted with that of his supervisor. Mother asserts that upon being informed of the conflicting testimony, and because Reed's testimony was the only evidence of positive drug tests, the "judge should have granted the continuance. When he denied the continuance originally, he said that he may consider granting it later in the day but he did not ultimately allow the case to be continued. A continuance would have allowed the witness with conflicting testimony to be brought in to Court to testify."

{¶ 56} Mother's second issue for review lacks merit. First, evidence of the supervisor's alleged conflicting testimony was not put before the juvenile court and therefore cannot be considered on appeal. As an appellate court, our review is strictly limited to the record before us and we cannot consider matters or facts that are outside the record or were not part of the trial court proceedings. *In re M.B.*, 2024-Ohio-3239, ¶ 47, fn. 5 (12th Dist.); *In re L.E.*, 2022-Ohio-3962, ¶ 27 (12th Dist.). Second, while Father's counsel alluded to the alleged inconsistencies in testimony, no motion for continuance was made to have the supervisor brought before the juvenile court, and any earlier oral

motions to continue were not made on the basis of needing further expert testimony for the drug tests. Finally, the drug test results from Forensic Fluids were not the only evidence of positive drug tests because the state also presented evidence of positive drug tests when Mother was at BrightView.

{¶ 57} We now turn to Mother's remaining issues for review, which essentially challenge the juvenile court's determination that it was in Jane's best interest to grant permanent custody to the Agency.

{¶ 58} As stated above, in examining the first best interest factor under R.C. 2151.414(D)(1)(a), the juvenile court simply found that Jane is doing well in the care of the foster family and that her visits with Father go reasonably well. The court does not reference Mother under this best interest factor. Although the juvenile court stated in its findings of fact that Mother clearly loves Jane and that she "has not been permitted to visit with [Jane] at the Agency for some time due to threats . . . made concerning an employee," the court does not tie these findings of fact to the best interest R.C. 2151.414(D)(1)(a) factor. The court also does not explain its evaluation of this factor regarding Mother or how its evaluation of this factor led the court to conclude that termination of Mother's parental rights was in Jane's best interest.

{¶ 59} The record shows that Mother regularly visited with Jane, and there was no testimony the visits did not go well. This is not a case where Mother has abandoned Jane or repeatedly failed to visit her. Then, on May 14, 2024, the Agency cancelled Mother's visit when she arrived late, and subsequently terminated all visitation after the Agency heard, second-hand from another parent, that Mother had made some threat in the parking lot after being denied visitation that day. The caseworker testified he had not heard the threat and no one else from the Agency testified about the threat or its content.

Mother was never able to resume visitation after that. The Agency's abrupt termination of Mother's visitation based upon a vague threat reported by another parent was severe and unjustified. The caseworker testified about his effort in assisting Mother to resume visitation—providing her with the option to reach out to other agencies' centers in surrounding counties as alternative locations for visitation—and asserted he would have advocated for visitation to be reinstated had Mother shown progress on her case plan. However, as far as he knew, Mother was not in counseling and her last drug test was positive. The caseworker's testimony does not demonstrate reasonable and earnest efforts by the Agency to assist Mother's resumption of visitation. Furthermore, the caseworker's assertion he would have advocated for visitation to resume seems somewhat disingenuous because there is no evidence Mother was informed that resumption of her visitation was conditioned upon showing progress on her case plan. After all, Mother had been allowed to visit with Jane until May 2024, despite her positive tests results for methamphetamine and her receiving counseling at various treatment facilities. Assuming Mother made a threatening remark directed at a caseworker or case aide, the Agency should not have relied upon it in terminating Mother's visitation without determining whether it was a legitimate threat or only a remark arising from Mother's frustration and disappointment in the moment.

{¶ 60} Concerning the fourth best-interest factor under R.C. 2151.414(D)(1)(d)—Jane's need for a legally secure permanent placement and whether that could be achieved without a grant of permanent custody to the Agency—the caseworker generally stated that Mother's first biological child and an aunt living in Kentucky could be possible placement options. Although the caseworker testified that the children have a good and loving relationship with their oldest sister, the Agency had decided that the older sister

would not be a placement option. The caseworker did not provide an explanation. The caseworker further indicated that the Agency had not heard back from Kentucky regarding the ICPC. There was no evidence of follow up or other steps taken by the Agency in finding and considering appropriate alternatives to permanent custody. There was no testimony that the foster family would consider or wanted to adopt Jane.

{¶ 61} The main obstacles to Mother's reunification with Jane and the reasons why her parental rights were terminated were Mother's substance abuse and the head-butting incident.

{¶ 62} The evidence presented by the Agency regarding Mother's substance abuse is based solely upon positive tests results and is most accurately characterized as proving only her status as an active drug user. In analyzing the best interest factors, the juvenile court did not determine whether any of the factors in R.C. 2151.414(E)(7) thru (11) apply to Mother or Father. As pertinent here is R.C. 2151.414(E)(9), which considers whether "the parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to [R.C.] 2151.412 requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child." Though the juvenile court did not cite the statutory provision above, it found that Mother's chemical dependency was so severe that she was unable to provide an adequate permanent home for Jane at the present time and within a year afterward. In support, the court cited R.C. 2151.414(E)(2).

{¶ 63} Although Mother's use of methamphetamine was relevant evidence that the juvenile court should consider, the Agency presented no evidence that methamphetamine use affected Mother's parenting and ability to provide a legally secure home for Jane, that

it formed a part of Jane's environment, or that it adversely impacted Jane. *See In re Knuckles*, 2003-Ohio-4418 (12th Dist.); *In re A.A.*, 2009-Ohio-5884 (9th Dist.). There was no evidence that Jane was aware of Mother's substance abuse or that she had observed Mother use methamphetamine. There was no evidence that Mother used methamphetamine in front of or around Jane. Neither the caseworker nor the GAL testified that they observed Mother exhibit substance abuse symptoms or saw evidence of methamphetamine or drug paraphernalia in Mother's house. "Evidence of [substance] use by a parent may be a relevant consideration in a permanent custody case where the case plan addresses substance abuse, however 'the conduct of a parent is relevant . . . solely insofar as that parent's conduct forms a part of the environment of this child.'" *In re S.D-M.*, 2014-Ohio-1501, ¶ 24 (9th Dist.), quoting *In re A.A.* at ¶ 44. Here, the Agency solely focused on Mother's status as an active drug user and failed to present evidence that Mother's drug use adversely impacted Jane in any way.

{¶ 64} This court does not condone a parent's use of an illegal substance or abuse of a legal substance, and certainly does not condone Mother's methamphetamine use. Her actions regarding drug use and substance abuse treatment are inappropriate and unsalutary. We also recognize that a parent's drug use may or can result in environmental risks to his or her children. However, to warrant state intervention under R.C. Chapter 2151 in removing a child from the parents' custody and in terminating parental rights, the State must show more than simply positive drug test results. A negative consequence must be shown to have an adverse impact upon the child, and that impact must be specifically demonstrated in clear and convincing manner. As we stressed above in Father's appeal, termination of parental rights is an alternative of last resort and a parent has no burden to prove that his or her rights should not be terminated. *In re D.M.*, 2020-

Ohio-3273, at ¶ 49 (1st Dist.).; *In re S.D-M.*, 2014-Ohio-1501, at ¶ 33 (9th Dist.). Rather, it was the Agency that had the burden to prove, by clear and convincing evidence, that termination of Mother's parental rights was warranted. As the record is devoid of any evidence demonstrating that Mother's drug use had an adverse impact on Jane, the Agency did not meet its burden.

{¶ 65} We also note that the caseworker testified (1) that Mother did not complete her mental health counseling at Talbert House and Autumn Behavioral, (2) that Mother went to BrightView for substance abuse treatment but was discharged from the program for poor attendance, (3) that he did not have any documentation that Mother was still attending Boulder Care, (4) and that he did not have documentation that Mother completed treatment programs at Talbert House, BrightView, Boulder Care, or Autumn Behavioral. Mother testified that she signed several releases of information multiple times. The record indicates that she did so for unidentified providers. The caseworker testified that Mother signed a release for Boulder Care, that he had requested records from the provider, and that he did not recall receiving them. In support of the caseworker's overall testimony, the State submitted only one exhibit, the letter BrightView sent to the Agency on May 14, 2023, which provided that Mother's last kept appointment occurred in March 2023, that she had no upcoming counseling sessions, and that progress reports would be paused until Mother re-engaged or was discharged. Contrary to the State's assertion, the letter does not state that Mother was discharged from the program or that she was allegedly discharged because of poor attendance. Mother testified that by the time BrightView sent the letter, she had left the program on her own accord and had transferred to Boulder Care.

{¶ 66} Despite its burden of proof and evidence that Mother had signed releases

of information, the Agency did not provide any other evidence of Mother's alleged failure to attend counseling and complete treatments. Two separate case plans in 2024 directed the caseworker to follow up with Mother's mental health and substance abuse treatment providers to obtain progress reports on treatment. The record suggests that the Agency was less than diligent in requesting, following up, and obtaining documentation from various providers attesting to Mother's participation or failure to participate in treatment, her attendance, any discharge, or her completion or failure to complete treatment. Nonetheless, the caseworker's perception that Mother was not in counseling was the reason why he did not advocate for Mother's visitation with Jane to be reinstated. Given the limited evidence presented by the State, the juvenile court erred in finding that Mother received sporadic mental health and substance abuse counseling throughout the case.

{¶ 67} The other obstacle to Mother's (and Father's) reunification with Jane was the head-butting incident and allegations of domestic violence. In reciting the evidence presented at the permanent custody hearing in its February 18, 2025 entry, the juvenile court noted the incident and Mother's and Father's respective versions. Then, in examining the best interest factor under R.C. 2151.414(D)(1)(d), the court listed the parents' relationship. Although the caseworker and the GAL insisted that domestic violence concerns prevented reunification, the only evidence presented was the head-butting incident. Following that incident, no charges were filed, the juvenile court issued a no-contact order and vacated it a few months later, and both Mother and Father were simply asked to complete the domestic violence OCEPI workbook, which they did. Despite this single incident between Mother and Father in their long history together, the GAL characterized the relationship as involving patterns of domestic violence that "would likely reassert themselves" were the family back together, and stated that the home

provided by Mother and Father was "very unstable" and one where domestic violence had happened. When asked if it was possible there was no additional domestic violence after the head-butting incident, the GAL flippantly replied, "It's possible that Paris is not in France, but I believe it is there." The GAL also testified there was no evidence Jane's basic needs were not met, yet insisted that Mother had not demonstrated the ability to provide for Jane's basic needs.

{¶ 68} The Agency had the burden to prove, by clear and convincing evidence, that termination of Mother's parental rights was warranted. The purpose of the termination of parental rights statutes is to make a more stable life for the dependent children and to facilitate adoption to foster permanency for children. *In re A.L.*, 2024-Ohio-1992, ¶ 44 (8th Dist.). This court does not look upon these matters lightly, and this case is certainly no exception. But in light of the above and given the evidence before the juvenile court on the best interest factors, we must conclude that the Agency did not meet its burden and the juvenile court erred in finding that terminating Mother's parental rights and granting permanent custody of Jane to the Agency was in Jane's best interest.

{¶ 69} In light of the foregoing, the juvenile court's February 18, 2025 entry granting permanent custody of Jane to the Agency is reversed. Mother's second and fourth assignments of error and Father's first assignment of error are sustained.

{¶ 70} The parents' remaining assignments of error are as follows.

{¶ 71} Mother's Assignment of Error No. 1:

> TRIAL COUNSEL WAS INEFFECTIVE CAUSING A VIOLATION OF [MOTHER'S] SIXTH AMENDMENT RIGHT TO COUNSEL AND THE COURT SHOULD HAVE GRANTED A CONTINUANCE AS REQUESTED TO ALLOW MOTHER TIME TO PREPARE FOR TRIAL.

{¶ 72} Mother's Assignment of Error No. 3:

THE JUVENILE COURT ERRED IN FAILING TO GRANT MOTHER ADDITIONAL TIME TO COMPLETE HER CASE PLAN.

{¶ 73} Father's Assignment of Error No. 2:

THE JUVENILE COURT ERRED BY ALLOCATING ANY WEIGHT TO THE [GAL'S] REPORT OR TESTIMONY, BECAUSE HER INVESTIGATION WAS DEFICIENT AND FAILED TO MEET THE REQUIREMENTS.

{¶ 74} In light of our resolution of Mother's second and fourth assignments of error and Father's first assignment of error, and our reversal of the juvenile court's decision granting permanent custody of Jane to the Agency, the remaining assignments of error above are moot and we do not decide them. *See* App.R. 12(A)(1)(c).

{¶ 75} In Case No. CA2025-03-024, the judgment or final order appealed from in Juvenile Case No. 20223013 is vacated as to the granting of permanent custody of Brian, and, in both Case Nos. CA2025-03-024 and CA2025-03-025, the granting of permanent custody of Jane in Juvenile Case No. 20223014 is reversed and remanded for further proceedings consistent with the above opinion.

SIEBERT, J., concurs.

BYRNE, P.J., concurs separately.

**BYRNE, P.J., concurring separately.**

{¶ 76} I concur with and fully join the court's opinion. I write separately, however, to emphasize a few points.

{¶ 77} I have grave concerns about Mother's positive drug test results indicating methamphetamine use. Methamphetamine is a dangerous and highly destructive illegal drug. In most cases, methamphetamine use will lead a parent to act in ways that directly or indirectly harm their children, leading to the need to temporarily remove the children

- 33 -

from the parent's custody, and eventually to grant permanent custody of the children to an agency.

{¶ 78} But we are only able to decide cases based on the record before us. And the record before us in this case does not include *any* testimony or other evidence concerning any link between Mother's methamphetamine use and resulting harm to Jane. I find it hard to believe that such evidence does not exist, but I also am not permitted to invent evidence where none exists. It is unclear why the state did not present testimony or other evidence at the permanent custody hearing concerning how Mother's drug use may have harmed Jane.

{¶ 79} I am also concerned about Father's alleged incident of domestic violence involving head-butting. As with illegal drug use, domestic violence will often justify temporarily removing children from a parent's custody, and possibly lead to a permanent custody decision. But in this case the evidence about the head-butting incident was contradictory, and the state did not offer evidence regarding any other incidents of domestic violence, let alone its impact on Jane. And in the end, the agency itself apparently dropped its concerns about domestic violence, as the caseworker testified that Father's housing situation was the *only* concern preventing the children's reunification with Father.

{¶ 80} In the absence of evidence of harm to Jane in the circumstances of this particular case, we must find for Mother and Father. We have stated on numerous occasions that parents have a "constitutionally protected liberty interest in the care and custody of [their] child," *In re N.L.*, 2025-Ohio-2625, ¶ 20 (12th Dist.), and that such parental rights are "fundamental," *In re H.G.*, 2015-Ohio-1764, ¶ 30 (12th Dist.), citing *Troxel v. Granville*, 530 U.S. 57, 66 (2000). While we have usually made these statements

in cases in which we have granted permanent custody to an agency, these statements are not mere legal boilerplate or window dressing. Fundamental parental rights are real, and they are critical to maintaining the family as what it is: the fundamental, and most important, building block of any healthy society.

{¶ 81} Parental rights are so important that, in order to terminate those rights, "the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.); R.C. 2151.414(E). As explained in the court's opinion, the state did not present evidence that was critical to meeting this high bar so, despite my concerns, the agency's request for permanent custody should have been denied.

{¶ 82} I share the agency's concerns about Mother and Father, who are far from perfect parents. Mother, in particular, needs to turn her life around; the failure to do so could lead to further litigation involving Jane or to criminal charges against Mother. But the law does not permit the courts to terminate parental rights merely because parents make poor choices. In this Constitutional Republic, the government, for very good reason, must meet a high standard to obtain the termination of parental rights. It did not do so here.

SIEBERT, J. concurs in the foregoing concurring opinion.

**SIEBERT, J. concurring.**

{¶ 83} While I fully concur with the majority opinion, I also concur with the concurring opinion written by Judge Byrne.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that in Case No. CA2025-03-024, the judgment or final order appealed from in Juvenile Case No. 20223013 be, and the same hereby is, vacated as to the granting of permanent custody of B.T., and, in both Case Nos. CA2025-03-024 and CA2025-03-025, the granting of permanent custody of J.C in Juvenile Case No. 20223014 is reversed and remanded for further proceedings consistent with the above Opinion.

It is further ordered that a mandate be sent to the Clinton County Court of Common Pleas, Juvenile Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed 100% to appellee.

/s/ Matthew R. Byrne, Presiding Judge

/s/ Mike Powell, Judge

/s/ Melena S. Siebert, Judge